# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOHN MIKEL CASTLEBERRY,

        Plaintiff,

v.                                     No. CIV 03-583 JP/LFG

JOHN SHANKS, et al.,

        Defendants.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

### Introduction

This is a *pro se, informa pauperis* civil rights action brought under 42 U.S.C. § 1983 by Plaintiff John Mikel Castleberry ("Castleberry"). Castleberry was formerly incarcerated at the Central New Mexico Correctional Facility ("CNMCF") in Los Lunas, New Mexico but has since paroled as of late Fall, 2003. [Doc. Nos. 34, 36.] His Civil Rights Complaint [Doc. No. 1], filed May 14, 2003, and his amended complaint [Doc. No. 13], filed July 23, 2003, initially asserted thirteen claims against forty-five defendants and purportedly attempted to bring a class action lawsuit. In a Memorandum Opinion and Order [Doc. No. 12], filed July 23, 2002, the Court dismissed all but five claims, denied the request for class certification and dismissed a number of defendants except for ten remaining

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

Corrections Department Defendants and named Defendant Dr. Sandra Penn, who apparently is or was an independent medical contractor. All of the Corrections Department Defendants filed an Answer. However, Dr. Penn, while signing a waiver of service, has never filed an Answer, nor any subsequent pleading in this case.

On November 13, 2003, the Court entered an Order Directing Submission of Martinez report with respect to Castleberry's five remaining claims as asserted against the ten Corrections Department Defendants. [Doc. No. 33.] The Court's Order stated that Dr. Penn would be notified of this Order and that she might be required to submit a separate Martinez report at a later date if necessary. On December 17, 2003, the Corrections Department Defendants submitted their Martinez report and a Motion to Dismiss. [Doc. Nos. 35, 36.] On January 22, 2004, Castleberry filed a Motion for Extension of Time Frame. [Doc. No. 37.] He argued that he required an additional three months to review records and submit proper evidence to the Court because of Defendants' falsification of records. He also noted that Dr. Penn had not answered the summons issued by the Court. On January 27, 2004, the Court issued an Order permitting Castleberry an extension from January 20, 2004 (the original deadline for his response) to February 26, 2004. [Doc. No. 38.] As of today, **April 16,** 2004, Castleberry has filed no response to the Martinez report, nor any opposition to Defendants' Motion to Dismiss. In addition, Castleberry did not file a motion for default judgment against Dr. Penn for her failure to answer the Complaint. The Court determines for the reasons stated below that there is no need for Dr. Penn to produce a separate Martinez report. Thus, this matter is ready for resolution.

**Procedural Background**

Castleberry's remaining five claims are as follows:

(1) On August 28, 2002, Castleberry alleges that he sustained cuts by falling against a broken sink. He claims Defendants failed or refused to provide adequate medical treatments for these wounds and related medical conditions, including a back problem, dental problems and Hepatitis C., in violation of his Eighth Amendment and due process rights. [Claim III, original Complaint, revised version attached to his July 23, 2003 "Supplemental" (or amended) Complaint.]

(2) On about March 6, 2003, Defendant Penn refused to provide him with necessary medications, physical therapy, and other medically necessary items that had been prescribed for him., in violation of his Eighth Amendment and due process rights. [Supplemental Claim I, July 23, 2003 "Supplemental" (or amended) Complaint.]

(3) Castleberry claims he was retaliated against for having filed grievances, in violation of his First, Fourteenth and Sixth Amendment rights.[2] Specifically, he asserts that he was retaliated on July 28, 2002 when Defendants Vallo and Gonzales searched his cell; on July 29, 2002, when Defendant Gonzales conducted a "shakedown" of Castleberry and Defendants Lopez, Hayes and Vallo searched his cell and confiscated certain religious items; on August 28, 2002 when Defendant Murphy placed him in segregation without reason; in February 2003, when Defendants wrongfully withheld a 30-day lump sum award to him; on February 28, 2003 until March 5, 2003, when Defendants moved him to CNMCF and placed him in inhumane conditions without a bed or running water; and in February 2003, when Defendants moved him to CNMCF without proper classification proceedings which

---

[2]The Court analyzes these claims has falling within the First Amendment. It finds no basis to analyze them under the Sixth or Fourteenth Amendment, nor did Castleberry provide such a basis.

resulted in his placement with inmates having higher classification levels. [Claim V (and allegations taken from other claims), original Complaint, revised version attached to July 23, 2003 "Supplemental" (or amended) Complaint.]

(4) Defendant Reshetnik made slanderous and untrue statements about Castleberry's having stolen religious items from the chapel, thus subjecting him to threats of harm from other inmates, in violation of his Fifth and Fourteenth Amendment rights. [Claim VII, original Complaint, revised version attached to July 23, 2003 "Supplemental" (or amended) Complaint.]

(5) Defendants Muth, Sylvestre, Leyva, Hathaway and Murphy failed to provide due process in a committee proceeding on February 27, 2003, resulting in withholding a 30-day lump sum award which Castleberry earned for completing a relapse prevention program. [Claim X, original Complaint, revised version attached to July 23, 2003 "Supplemental" (or amended) Complaint.]

In their Motion to Dismiss (filed concurrently with their Martinez report), the Correction Department Defendants seek dismissal, under Fed.R.Civ.P. 12, of all of Castleberry's claims as asserted against each of the Correction Department Defendants. [Doc. Nos. 35, 36.] As stated previously, Castleberry filed no response to the Motion to Dismiss or to the Martinez report, although he requested and received an extension to do so.

The Court's Order directing submission of the Martinez report [Doc. No. 33] explained that the Martinez report could be used for summary judgment purposes and that Castleberry would be given an opportunity to respond to the report and to provide conflicting evidence, should any exist. The parties were further advised that the Martinez report could be used in deciding whether to grant summary judgment on Castleberry's claims and that all parties should submit whatever evidence might be relevant.

In the Order directing submission of the Martinez report, the Court directed Defendants to respond to Castleberry's remaining claims and allegations by providing responses to the allegations, pertinent documentation and a report addressing all of these matters. The Corrections Department Defendants provided the requested materials, including Castleberry's medical records and the grievances he filed. In deciding this matter, the Court considered all of the pleadings and attachments, including Castleberry's original and amended complaints (and attachments) and Defendant's Martinez report along with all the exhibits.

## Summary Judgment Standard

The Court may grant summary judgment, under Rule 56(c) of the Federal Rules of Civil Procedure, if the pleadings, depositions, answers to interrogatories and admissions or affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The opposing party must be given notice and an opportunity to respond, as provided in Rule 56. Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

The Corrections Department Defendants, having filed a Martinez report, are in the same position as a movant for summary judgment and therefore, carry the burden of establishing that there is no genuine issue of material fact for trial. These Defendants may satisfy that burden by showing an absence of evidence to support Castleberry's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the movants meet their burden, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on a material matter. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The party opposing the motion may not rest on pleadings, mere argument, or contention but must set forth specific facts through admissible evidence, showing there

is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof. If he cannot make such a showing, summary judgment is appropriate. Celotex, 477 U.S. at 324.

However, the Tenth Circuit has recently explained that the nonmovant's burden to respond arises only where the summary judgment motion is properly "supported." Reed v. Bennett, 312 F.3d 1190, 1194 (10th Cir. 2002).

> Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c). If the evidence produced in support of the summary judgment motion does not meet this burden, ' summary judgment must be denied, *even if no opposing evidentiary matter is presented.*

Id. (emphasis in original) (internal citation omitted). Thus, the Court must decide whether Defendants have met their initial burden of demonstrating that no material issues of fact remain for trial. Id. Here, the Court determines that the Corrections Department Defendants have met their initial burden and that summary judgment should be granted in their favor.

### Analysis

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their Motion to Dismiss/Martinez report, the Correction Department Defendants do not expressly argue that Castleberry failed to exhaust his administrative remedies, although they do, at times, discuss the untimeliness of certain grievances. The lack of the failure to exhaust argument might be construed as a concession by Defendants that Castleberry did exhaust his administrative remedies. However, the Court notes that a defendant's failure to raise the argument does not waive the defense. The petitioner, not the defendant, must bear the burden of affirmatively showing exhaustion. Steele v. Federal Bureau of Prisons, 355 F.3d 1204, 1209-10 (10th Cir. 2003). Moreover, if a petitioner fails to demonstrate that he exhausted his administrative remedies before

filing a § 1983 action regarding prison conditions, dismissal of the claims is mandatory. 42 U.S.C. 1997e(a); <u>Booth v. Churner</u>, 532 U.S. 731, 736-37 (2001); <u>Steele</u>, 355 F.3d at 1211.

Here, it appears that Castleberry filed a number of grievances regarding the remaining claims. It is not clear, however, whether he exhausted his administrative remedies completely as to the appeal process under the facility's grievance policy. Defendants neither produced their grievance policy nor any evidence as to Castleberry's possible satisfaction of the policy. Thus, the Court concludes that there are genuine issues of material fact as to whether Castleberry exhausted his administrative remedies with respect to the remaining five claims and will not decide this matter on that basis.

## II.     CASTLEBERRY'S CLAIMS

### A.     Lack of Medical Treatment in Violation of Eighth Amendment and Due Process Rights (Claim III & Supplemental Claim I)

Under certain conditions, denial or delay of treatment by prison medical personnel can constitute cruel and unusual punishment in violation of the Eighth Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976), *reh'g denied*, 429 U.S. 1066 (1977). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment [internal quotation marks omitted]." <u>Id.</u> at 106.

The "deliberate indifference" standard has two components, one objective and one subjective. <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991). In order to recover, a plaintiff must make a two-part showing: (1) that the medical need was "sufficiently serious," and (2) that the offending officials acted with a culpable state of mind, in that they knew or must have known about the serious medical need but intentionally refused to provide medical care. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994);

DeHerrera v. Kropinak, 3 Fed. Appx 797, 2001 WL 81999 at *2 (10th Cir. N.M. Jan. 31, 2001) (*citing* Sealock v. Colo., 218 F.3d 1205, 1209 (10th Cir. 2000)).

An inmate may satisfy the objective component by showing that a sufficiently severe condition was diagnosed by a physician and required treatment. On at least one occasion, the Tenth Circuit has further commented that "[t]he objective component requires an 'extreme deprivation' denying a 'minimal civilized measure of life's necessities.'" Rashad v. Doughty, 4 Fed. Appx 558, 561, 2001 WL 68708 at *1 (10th Cir. Jan. 29, 2001) (*citing* Hudson v. McMillian, 503 U.S. 1, 9 (1992)).

In addition, with respect to claims that medical treatment was delayed, the inmate must demonstrate that the delay resulted in "substantial harm." Sealock, 218 F.3d at 1210. "Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical losses." Gresham v. Flowers, 208 F.3d 226 (Table, Text in Westlaw), 2000 WL 192926 at *2 (10th Cir. Feb. 17, 2000) (internal citations and quotation marks omitted); Thompson v. Hamilton, 127 F.3d 1109 (Table, Text in Westlaw), No. 97-6084, 1997 WL 639320 at *1 (10th Cir. Oct. 14, 1997) ("Mr. Thompson's claim that he went untreated for 90 days, without a showing of harm, is insufficient.")

With respect to the subjective element, the inmate must allege facts supporting an inference that Defendants knew about and disregarded "a substantial risk of harm to his health or safety." Oxendine v. Kaplan, 241 F.3d 1272, 1276-77 (10th Cir. 2002). Deliberate indifference may be demonstrated under circumstances when prison officials prevent an inmate from receiving treatment by medical personnel capable of evaluating the need for treatment. Id. at 1279 (internal citation omitted).

However, a mere delay in treatment, without more, does not amount to deliberate indifference. Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993); White v. Colorado, 82 F.3d 364, 366-67 (10th Cir. 1996). "Although a delay in treatment is a relevant consideration, . . . , the ultimate finding of deliberate indifference necessarily requires findings that the prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that he drew that inference." Garrett v. Stratman, 254 F.3d 946, 950 n. 4 (10th Cir. 2001) (internal citation omitted).

### 1. *August 28, 2002*[3] *(Claim III)*:

Here, two of Castleberry's claims implicate Eighth Amendment concerns. He asserts first that on August 28, 2002, while in isolation, he "obtained numerous cuts, because of a porcelain sink that broke, when I slipped because of a leaking toilet." [Doc. No. 13, revised original Complaint attached, Claim III.] He states further that he had a known back condition (degenerative disc disease), Hepatitis C, and dental problems, none of which were adequately treated. [Id.]

He filed a grievance, dated August 31, 2002, with respect to this incident. He stated that he received cuts to his fingers after slipping in waste from an overflowing toilet. He reported it immediately and requested to see a nurse for treatment because the waste was in his wounds. He asserts that he did not see a nurse and was not given his medications while in this unit. He was not treated until a day or two later, or on August 30, 2002 when he was returned to CMRU. [Doc. No. 36, Ex. 10.] Castleberry's grievance was answered by Associate Warden Murphy, who stated that

---

[3]The Court's Order requiring the Martinez report incorrectly referred to this date as August 8, 2002, rather than August 28, 2002. [Doc. No. 33.] Castleberry's Complaint stated the pertinent date was August 28, 2002. Defendants' Martinez report also mistakenly referred to the August 8 date. Defendants responded that Castleberry was not in segregation on that date and filed no grievances as to that date. However, the materials attached to the Martinez report and Castleberry's January 22 Motion for Extension of Time Frame do address the August 28 incident. Thus, the Martinez report need not be supplemented as to this incident.

they did not have any information or documentation that reflected any incident occurring at CNMCF involving him. However, Castleberry any additional information regarding the incident would be reviewed if it was provided to officials. Otherwise, the matter was closed. [Id.] There is no indication that other materials were forwarded to Murphy. There is, however, a misconduct report, dated August 28, 2002, attached to Castleberry's motion for extension of time, regarding a charge of damage to property. That report states that on August 28, the officer was called by Castleberry and advised that Castleberry had cut his fingers by lifting a broken sink back up to its position. Castleberry told the officer that he was using the toilet and it started to flood, at which point he stood up, almost fell, and grabbed for the sink which fell to the floor and broke. Nothing in this record indicates the severity of Castleberry's cuts. [Doc. No. 37, attachment.]

There is a medical record, dated August 30, 2001, that (based on other dates in the record) probably should read August 30, 2002. It states that Dr. Featherstone saw Castleberry on that date for complaints of musculoskeletal/back pain. Castleberry indicated that he had been trying to see a doctor for a couple of weeks and asking for relief from kitchen duty due to chronic right shoulder and back pain. The doctor noted that he did not appear in any distress and that Dr. Deming, on August 13, 2002, had reviewed his case extensively. The record also discusses that Dr. Delahoussaye had seen Castleberry and had recommended light work (20 pound lifting maximum). [Doc. No. 36, Ex. 1.] Nothing in the record discusses cuts that Castleberry had suffered several days before this date or treatment needed for those cuts.

With respect to this claim (treatment for the cuts), Castleberry fails to provide sufficient evidence to satisfy either prong of the two-part test. There is no evidence that he had a medical need that was "sufficiently serious" or that he suffered an extreme deprivation. In addition, he fails to

demonstrate that a two-day delay in treatment (to the extent that he even needed treatment for the cuts) resulted in substantial harm, or any harm at all. This clearly was not a life-threatening situation, nor does Castleberry show that the delay exacerbated his medical losses. Moreover, even if Castleberry could show that he suffered a "sufficiently serious" injury that went untreated and caused him harm, he fails to demonstrate that Defendants knew about and disregarded a substantial risk of harm to his health or safety. Thus, because Castleberry fails to raise a genuine issue of material fact, the claim cannot survive.

Castleberry also contends as of this same date that his other medical conditions were not being treated, including his back problems, Hepatitis C and dental concerns. Again, Castleberry fails to produce evidence that he was not being treated or that Defendants were deliberately indifferent to his serious medical needs. Indeed, the medical records that were produced demonstrate that Castleberry was being seen by medical care providers regularly in 2002. For example, on January 14, 2002 and on a number of other occasions, he received therabands with which to exercise. On January 31, 2002, x-ray images were taken of his shoulder that revealed normal joint widths and essentially unremarkable results. He had a normal right shoulder. On February 5, 2002, he had an ultrasound of his right shoulder that showed a small partial tear. Otherwise, the results were unremarkable. On March 8, 2002, he was taking Darvocet and Motrin for pain. On March 21, 2002, he saw Dr. Deming for follow up as to his right shoulder injury. On March 26, Dr. Deming again saw him and changed his medications. On March 29, 2002 he requested to see the doctor and asked for extra padding for his bunk. On April 1, he was seen and given pain medication.

On July 3, 2002 he requested dental care for pain in his wisdom teeth. On July 5, 2002, he saw Dr. Deming again and told her the Naproxen was not helping his back pain. He was given

Ibuprofen and shown exercises to do again. On July 11, 2002, it appears that his teeth were cleaned as requested. Another July 11 record shows that Castleberry was going up the stairs two at a time when he missed one and grabbed the handrail wrenching his shoulder.

An August 13, 2002 medical record indicates that Castleberry suffered from chronic lower back pain and right shoulder pain. The record goes on to state that he brought a form with him regarding a student loan that could be partially forgiven if he could obtain a doctor's statement that he was permanently and totally disabled. He told the doctor that he had not gone on disability before incarceration because he felt he could earn more if he was not on disability. Dr. Deming did not conclude that he was permanently and totally disabled and refused to fill out the form. She gave him back exercises to do.

On August 21, 2002, he complained of severe pain from his teeth. On August 22, he was issued Ibuprofen for the swelling. He asked for an extra or double mattress at this time. He filed a grievance regarding his health care complaints and the response was that while Castleberry was given some restrictions, he also was cleared for kitchen work. The warden had looked into his medical status but there was no evidence or information that he did not receive the medical treatment that he needed. On October 11, 2002, there is a receipt for an eggcrate mattress. Through 2002, the medical records indicate that Castleberry was seen on numerous occasions regarding his health care complaints and that he was prescribed various medications.

On January 3, 2003, a routine exam of the lumbosacral spine revealed well-maintained bodies and spaces. The result of the x-ray was unremarkable. A normal lumbar spine was the impression. On February 4, 2003, a lab result indicated that Castleberry was positive for Hepatitis C. A March 11, 2003 medical record notes that there is symptom magnification with respect to Castleberry's back

pain complaints. Still, he was receiving medical care treatment and prescriptions in 2003 for his back pain. [Doc. No. 36, Ex. 1.]

These medical records are uncontroverted by Castleberry. He simply fails to meet the requirements of the Eighth Amendment, in that he does not raise a genuine issue of material fact that he had serious medical needs to which Defendants were deliberately indifferent. Thus, these claims also must fail.

Finally, a part of this August 28, 2002 claim may be read to include Castleberry's complaint that he was placed in isolation for one to two days. The records attached both by Defendants and Castleberry indicate that he was placed into "Involuntary Interim Level #6" due to no room in the general population. However, this placement did not last longer than a day or two. Indeed, based on Exhibit 9 to the Martinez report, it appears that he was released on August 29, 2002 from this placement.

Castleberry was not placed in segregation for punitive purposes. Rather, it appears that he was placed there temporarily for administrative reasons related to lack of space in the general population. Castleberry does not claim that he did not have shelter, food or a toilet, for example. Again, he fails to raise a genuine issue of fact to demonstrate that he was not provided basic human conditions of confinement, including adequate food, clothing, shelter and medical care and/or reasonable measures to guarantee his safety. Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998). Thus, this claim also cannot survive Eighth Amendment scrutiny.

In addition, to the extent that Castleberry intended to assert a separate Fifth Amendment due process claim based on allegations that he was not provided medical treatment, that claim too must fail because it essentially implicates Eighth Amendment concerns and analysis. See Wilson, 501 U.S.

at 297 ("'Unnecessary and wanton infliction of pain' implicated the Eight Amendment.") *See also* Pelfrey v. Chambers, 43 F.3d 1034, 1036 (4th Cir.) (After conviction . . . Any protection that substantive due process affords convicted prisoners against excessive force, is we have held at best redundant of that provided by the Eighth Amendment."), *cert. denied*, 515 U.S. 1116 (1995). Therefore, because the court already rejects the Eighth Amendment claims, the due process claims similarly fail.

### 2. *March 2003 Medical Treatment (Supplement Claim I):*

Castleberry alleges that on March 6, 2003, upon his arrival at PNM-MRU, he was told he could not have his prescribed back medication, and that Dr. Penn refused his requests for medication, an eggcrate mattress, cotton blankets and physical therapy. He further asserts that he did not get any type of back medication until about May 16, 2003. He claims he was assigned a kitchen job that violated his medical restrictions.

Defendants provided documentation for this time period demonstrating that x-rays of Castleberry's lumbar spine was normal. A February 2003 record, that is difficult to read, indicates that the provider noted some swelling on Castleberry's back but the provider was uncertain as to whether that swelling was always present. As of March 6, 2003, he appeared to be taking Darvocet and Ibuprofen. On March 11, 2003, Dr. Penn saw Castleberry and noted that he had back problems since 1999. She examined him, observing that he moved easily in and out of a chair but got on the exam table with difficulty. She also reviewed his x-rays that were unremarkable. She concluded there was symptom magnification and prescribed Ibuprofen but not Darvocet. There are no other medical records after this date until July 2003, when he was again seen for back pain complaints. His prescription for Ibuprofen was refilled on July 16. There are no medical records for this time period

14

indicating that Castleberry requested mattresses or prescriptions that he did not receive and no records indicating that he had prescriptions for items that he requested and did not receive.

Moreover, although he was given some medical restrictions regarding weight lifting and movement in September 2002, he was also cleared to work in food service as of that date. [Doc. No. 36, Ex. 2.] On February 28, 2003, Dr. Romero also restricted Castleberry from lifting over 20 pounds and stooping, standing for long periods or bending but the doctor still cleared him for work in food service. [Doc. No. 36, Ex. 3.] In his March 7, 2003 grievance (that was rejected for not being timely), Castleberry claimed that Dr. Romero told him he could not be assigned to his present work detail due to medical conditions. Yet, at least with respect to kitchen work, he had been cleared to work by Dr. Romero, just one week earlier than the date of his grievance.

It is clear that Castleberry disagreed with Dr. Penn's conclusion of symptom magnification and perhaps with her decision not to prescribe him Darvocet. However, an inmate does not state a constitutional violation when he disagrees with the medical treatment or diagnosis. Estelle, 429 U.S. at 107; Oxendine, 241 F.3d at 1277 n.7; Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. 1968). Based on the uncontroverted documentary and medical evidence, Castleberry fails to raise a genuine issue of material fact that he suffered from a "sufficiently serious" medical condition that the offending officials knew of or must have known about and yet for which they intentionally refused to provide medical care. Thus, the claim cannot survive.[4]

---

[4]The due process claim, based on these same allegations, also fails for the reasons stated *supra* at pages 13-14.

**B.**     **Retaliation (Claims V and X):**

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights, including his right of access to courts.[5] Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990). In Peterson, the Tenth Circuit noted:

> This principle applies even where the action taken in retaliation would be otherwise permissible. As the Supreme Court made clear . . . however, it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison, and our retaliation jurisprudence does not change this role. Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity. Accordingly, a plaintiff must prove that but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place. An inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.

Peterson, 149 F.3d at 1144 (citations and quotations omitted). *See also* Frazier v. Dubois, 922 F.2d 560, 562 n. 1 (10th Cir. 1990) ("Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.")

A court will find a genuine issue of material fact sufficient to defeat a defendant's request for summary judgment where an inmate files a grievance or engages in legal proceedings against prison officials and soon thereafter, faces potentially punitive actions, like a middle-of-the-night urinalysis or placement in segregation. Strope v. Gibbens, 2003 WL 1906458 at *6 (D. Kan. Apr. 17, 2003).

---

[5]To state a claim for relief under 42 U.S.C. § 1997e, an inmate must file a grievance before ultimately gaining access to courts. Thus, if an inmate provides proof that he was punished for filing grievances, his claim would fall under the First Amendment. Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989).

Likewise, summary judgment will not be entered in favor of a defendant where the plaintiff has alleged close temporal proximity between his initiation of grievances and punitive actions like the denial of food, water and/or exercise or repeated cell searches. Id. In Strope, the court denied Defendants' request for summary judgment on the retaliation claim where the plaintiff showed he was disciplined repeatedly closely following grievances that he filed against prison officials. On some occasions, the plaintiff in that case showed that the prison official refused to sign, date or answer the inmate's grievances and even denied him access to grievance procedures during significant periods of time. Id. at *4. The plaintiff, in Strope, provided specific evidence that on many occasions after he filed a grievance, he was harassed and/or denied certain privileges. Id. at *6.

Strope is distinguishable from the case at hand where Castleberry provides nothing more than general allegations of retaliation that are not linked in time to any grievances that he filed against prison officials. Indeed, Castleberry provides nothing more than scattered references to alleged retaliation, without any "but for" causal connection between his filing grievances and the alleged retaliatory acts.

### 1. Cell Searches:

For example, Castleberry alleges that "starting on" July 28, 2002, the retaliation began when officers conducted a search of his cell. The July 28 evening cell search was followed by another cell search on the morning of July 29, 2002. Nothing was taken from his cell during these two searches. [Doc. No. 13, Claim V.] Then later on July 29, 2002, a third cell search was conducted, that was characterized as a "shakedown." During this search, a crucifix, candles and a paint brush were removed from Castleberry's cell.

According to the grievances produced by Defendants, Castleberry did not file a grievance before the July 28-29, 2002 cell searches. The first grievance filed by Castleberry was dated August 31, 2002. Thus, it cannot be said that the cell searches were retaliation for grievances previously filed by Castleberry. Moreover, Castleberry provides no evidence to show that the cell searches were anything but routine in nature, in contrast to searches that might constitute calculated harassment against an inmate. Shakedowns and/or cell searches "are essential to the effective administration of prisons." Palmer v. Hudson, 468 U.S. 517, 529 (1984).

There was an inmate misconduct report filled out regarding the July 29, 2002 shakedown of Castleberry's cell. That report states that a shakedown was conducted and resulted in the seizure of five candles and a cross made out of pencils wrapped in tape sharpened at one end and a two-inch paint brush. There was a recommendation that this be treated as a major level infraction because the cross was sharpened at an end and could have cause harm. [Doc. No. 36, Ex. 4.] An investigation ensued and it was shown that Castleberry did not have approval from the chaplain to make the cross or to possess it and the other religious items. Castleberry received copies of these disciplinary materials and was notified of a hearing set for August 6, 2002. He did not attend the hearing. He waived notification and appearance at the hearing, and it was conducted without him being present. The hearing officer determined that Castleberry was guilty of a minor level infraction because officials were unable to determine whether the cross was a weapon or not. Nothing in these documents includes an allegation by Castleberry that he believed the cell search and seizure of items constituted retaliation.

Here, the Court determines that Castleberry fails to raise a genuine issue of material fact that "but for" retaliatory motive, the cell searches in July 2002 would not have been conducted. Accordingly, this retaliation claim must fail.

To the extent that Castleberry asserts that he was being retaliated against for exercising his First Amendment constitutional right to religious freedom, that claim must also fail. It is true that a prisoner retains the First Amendment right to religious freedom while incarcerated. However, prison officials may place certain restrictions on the exercise of that right in order to advance "valid penological objectives-- including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "[C]ourts are not to substitute their judgment on matters of institutional administration for the determinations made by prison officials, even when First Amendment claims have been made." Kikumura v. Hurley, 242 F.3d 950, 956 (10th Cir.2001). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977).

The First Amendment requires only that an inmate be accorded a reasonable opportunity to practice his religion, and "what constitutes a reasonable opportunity must be evaluated with reference to legitimate penological objectives of the prison." Mosier v. Maynard, 937 F.2d 1521, 1525 (10th Cir. 1991). In determining the constitutionality of restrictions on the exercise of religion, the Court must balance four factors: (1) the existence of a rational connection between the prison restriction and a legitimate governmental interest advanced as its justification; (2) the presence of alternatives for inmates to exercise the right; (3) the effect that elimination of the restriction would have on

19

guards, other prisoners, and prison resources; and (4) the existence of alternatives for prison officials without restricting inmates' rights to religious expression. *See* <u>Makin v. Colo. Dep't of Corr.</u>, 183 F.3d 1205, 1209 (10th Cir.1999).

Here, it is without question that prisons may conduct cell searches and random searches to effectively secure penal institutions, as well as to seize items that may be used as weapons. Nor can it be said, based on these allegations, that the seizure of candles and a cross unduly restricted Castleberry's right to religious expression, especially where the items were considered potentially dangerous. This type of restriction cannot be found unconstitutional under the above-described test.

Thus, to the extent that Castleberry alleged retaliation in violation of his First Amendment right of religious expression, that claim cannot survive. *See also* Memorandum Opinion and Order, filed July 12, 2003 [Doc. No. 12] (dismissing First Amendment Claim I.]

### 2.    *Segregation:*

Castleberry also alleges that he was retaliated on August 28, 2002 by being placed in segregation, apparently for having filed previous grievances. However, as noted above, there is no documentary evidence that Castleberry filed any grievances prior to being placed in segregation on August 28 for one to two days. Moreover, Defendants have provided documentation that he was placed only briefly in some type of segregation because there was no room in the general population. First, "[c]hanges to an inmate's housing status generally do not implicate a constitutional interest." <u>Purkey v. Green</u>, 28 Fed. Appx 736, 745, 2001 WL 998057 at *1 (10th Cir. Aug. 17, 2001). *See also* <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (mere transfer between institutions does not implicate due process clause even if the transfer results in a detrimental change in living conditions), *reh'g denied,* 492 U.S. 873 (1976). Moreover, Castleberry has not raised a genuine issue of material fact that

Defendants acted with the required retaliatory motive. Accordingly, this claim of retaliation cannot survive.

### 3. *Transfer:*

Castleberry also claims he was retaliated against on February 28, 2003 when he was moved to CNMCF and housed in inhumane conditions from February 28 to March 5, 2003. Again, he asserts this transfer was in retaliation for having filed grievances. Castleberry did file grievances prior to this transfer. Indeed, there are grievances regarding assorted complaints, dated August 31, 2002, September 5, 2002, February 18, 2003, and March 7, 2003 (subsequent to this alleged disciplinary action). The February 18 grievance is closest in time to the February 28 transfer. That grievance concerned Castleberry's complaint that a package was sent to him with religious materials that was not given too him. His grievance was denied on February 24 because the mail was received from a non-approved sender.

Defendants responded that Castleberry's classification actually changed on August 28, 2002[6] because he refused his work assignments at the Central New Mexico Minimum Restrict Facility. For this reason, he was temporarily housed in a day-room while awaiting placement in the Central New Mexico Correctional Facility, which was located across the street. This move occurred because of a change in classification according to Defendants. A prisoner enjoys no constitutional right to remain in a particular institution, although prison officials may not punish an inmate for exercising constitutional rights by transferring him to a different institution. Frazier, 922 F.2d at 561-62. In

---

[6]It is not entirely clear whether Defendants' response in their Martinez report addresses the pertinent allegations because Defendants discuss the August 28, 2002 transfer rather than the February 2003 incident. However, notwithstanding some possible confusion in the response, Castleberry fails to link any retaliatory act with the required "but for" improper retaliatory motivation.

addition, in general, a prisoner has no inherent constitutional right to enjoy a particular security classification. Templeman v. Gunter, 16 F.3d 367, 369 (10th Cir. 1994).

Here, again, Castleberry has failed to raise a genuine issue of material fact showing that Defendants took action against him *because of* his exercise of a constitutional right or *because* he had filed grievances about various complaints previously. In other words, he has not presented any evidence that "but for" the retaliatory motive, these actions would not have taken place. Castleberry simply has not provided specific facts showing retaliation or improper retaliatory motive. Thus, this retaliation claim cannot survive.

### 4.    *Classification Levels:*

Castleberry also alleges that he was retaliated against by being housed among inmates whose higher classification levels placed him at a risk of harm. It appears that this allegation pertains to the February 2003 time frame.[7] [Doc. No. 13, Claim X.] For example, he contends that "[o]n February 28, 2003, I was moved to CNMCF without any classification decision. This was in retaliation of exercizing [sic] my constitutional or department rights. I was illegally made a level III inmate and housed with these higher level (custody level), inmates."

On March 7, 2003, Castleberry signed a grievance stating that he was a Level II inmate who was housed in Level III custody with Level III inmates without classification procedures. According to the grievance, he was placed in a holding cell with two other inmates, without running water, with a leaking toilet/faucet, no ventilation, no property, no legal access, and no hygiene items. "This is a

---

[7]In July 2003, Castleberry was transferred from a Level II facility to a Level III facility based on an increase in his custody level score. As a result of his higher score, it was determined that he posed a threat to the security of the institution, which resulted in his transfer to a Level III facility. [Doc. No. 36, Ex. 11.] However, this transfer does not appear to form the basis of Castleberry's retaliation claim. [Doc. No. 13, Claim X.]

retaliatory measure for filing previous grievances." This grievance, received on March 21, 2003, was found to be untimely. Castleberry actually filed three grievances, regarding various complaints, all dated March 7, 2003, all received by prison officials on March 21, 2003, and all determined untimely.

To some extent, this retaliation claim may overlap with the previously discussed claim. In any event, while Castleberry did file several previous grievances (as discussed above), he fails to raise a genuine issue of material fact to show that the filing of a grievance was the "but for" cause of his placement. In other words, he does not demonstrate that "but for" Defendants' alleged retaliatory motive, this transfer would not have taken place. Thus, the claim cannot survive.

Should Castleberry be attempting to bring an Eight Amendment claim with respect to these allegations, that claim too would fail. In order to satisfy the deliberate indifference prong of an Eighth Amendment claim, Castleberry must allege and prove that the prison officials placed him in a facility with "known enemies" and that they did so deliberately. *See* Farmer, 511 U.S. at 837-39. Castleberry neither makes such allegations, nor raises a genuine issue of material fact sufficient to demonstrate such knowledge on the part of Defendants.

### 5. *Thirty-Day Lump Sum Award*

Castleberry asserts that he was retaliated against for filing past grievances when he was denied a 30-day lump sum award in February 2003, to which he believes he was entitled. [Doc. No. 13, Claim X.] Castleberry alleges that on February 27, 2003 he was called before a classification committee to receive a lump-sum award of 30 days for completing a relapse prevention program. When he arrived, he was advised that he would not receive the award, on orders of Captain Marez, because Castleberry was refused good time credit for the month of February 2003 after his failure to show up for work a good portion of that month. Castleberry claims this denial stemmed from a

grievance he filed against Captain Marez regarding mail Castleberry was denied, and that he actually had shown up for work during the pertinent days in February 2003.

It appears that Castleberry signed a grievance on March 7, 2003, regarding the hours he claimed that he worked in February 2003. [Doc. No. 36, Ex. 5.] He stated in that grievance that Defendant Leyva told the classification committee that Castleberry showed up to work on only two occasions during February 2003. Castleberry argued that Leyva could not have determined Castleberry's hours because Leyva was not present when Castleberry was at work. This grievance was not accepted because prison officials determined it was untimely. In any event, this grievance was signed and received subsequent to the classification determination on February 27, 2003. Thus, the classification committee's determination could not have been made in retaliation for this grievance.

However, Castleberry attempts to link the alleged retaliatory act in denying in a lump-sum award to a prior grievance he filed, dated February 28, 2003. In that grievance, Castleberry complained that he was refused a package that was sent to him containing religious materials and that Marez allegedly had given the chaplain permission to distribute the contents of the package to other inmates. The grievance was denied with the explanation that it was from a non-approved sender and over the "limit of materials in one's possession." [Doc. No. 36, Ex. 8.]

Defendants provided documentation of their lump sum meritorious deductions policy, eligibility criteria and Castleberry's February 2003 work assignment. [Doc. No. 36, Exs. 6, 7.] The documents show that Classification Officer Donna Sylvestre determined that Castleberry was not eligible for good time for February due to his 12 unexcused absences from work. The classification committee denied the lump-sum award recommendation having found Castleberry not eligible due

to his failure to receive "full good time." [Doc. No. 36, Ex. 6.] None of this documentation appears to have been signed by Marez.

The Court concludes, therefore, that Castleberry again has failed to demonstrate a genuine issue of material fact as to the required link between an alleged retaliatory act and his previously filed grievance. Castleberry's allegations of retaliatory motive are general in nature, rather than specific, and are simply insufficient to satisfy the requirements of a retaliation claim.

### C.      Slanderous/Untrue Statements Endangering Castleberry (Claim VII)

Castleberry claims that on July 29, 2002, an associate warden informed an addiction services employee that the associate warden had confiscated Castleberry's religious materials because he believed them to be stolen from the chapel. According to Castleberry, the associate warden stated that "inmate John Castleberry stole all this from the chapel." Castleberry claims that this turned out to be a lie and that the statement placed him in danger because inmates began calling him a thief and a Satanist and placed threats on Castleberry. Plaintiff alleges that these "slanderous acts" violated his right to due process under the Fifth and Fourteenth Amendments. The Court analyzes this claim under the Eighth Amendment. Ransom v. Corona, 9 Fed. Appx 755, 2001 WL 577038 at *1 (9th Cir. 2001) (substantive due process claim relating to inmate being placed in danger by being labeled a "snitch" is more properly brought under the Eighth Amendment). *See also* discussion *supra* at pages 13-14.

Castleberry's claim might be likened to the allegation that prison officials have labeled an inmate as a "snitch." Deliberate indifference by a prison official to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer, 511 U.S. at 828. In this circuit, for example, labeling an inmate a snitch has been found to constitute deliberate indifference to the safety of that

inmate.  Benefield v. McDowall, 241 F.3d 1267, 1271-72 (10th Cir. 2001) (internal citation omitted).

It is not entirely clear whether a statement by prison officials incorrectly accusing an inmate of stealing religious items would be comparable to being labeled as a snitch.  This is true because it is uncertain whether such a statement would subject the prisoner to the potential for great harm or would place him at a substantial risk of injury in the same way that being known as a snitch would.  However, even if the Court, without deciding this question, assumes it to be true, Castleberry's allegations that he was subjected to threats or called names falls short of the evidence he needs in order to raise a genuine issue of material fact to show he was placed in danger and/or that defendants knew or should have known of the danger associated with accusing him of stealing religious items.  Castleberry does not provide any evidence of the types and frequency of the threats or name-calling he actually faced (other than Satanist and thief) or from whom.  While he need not suffer an actual physical assault, here he has not even attempted to specify the threats that he purportedly encountered.  It is impossible to determine under these allegations what steps prison officials might have been required to take to have responded reasonably to any risk of harm.  Farmer, 511 U.S. at 844-45.

Here, Castleberry has failed to present facts sufficient to demonstrate a material factual dispute as to either the existence of a substantial risk or of serious harm or as to the Defendants' "deliberate indifference" to such risk of harm.  According to Defendants, Castleberry did not file a grievance as to any alleged threats and there is no record that he was threatened by any inmates as to the alleged statement made.  Thus, the claim must fail.

## D. **Denial of Due Process (Claim X):**

Castleberry alleges that he was denied due process in February 2003 when the classification committee denied the recommendation or request for the 30-day lump sum award (previously discussed in relation to Castleberry's retaliation claim). He asserts that Defendants did not adhere to departmental policies in denying the lump-sum award. [Doc. No. 13, Claim X.] The claim appears to be one asserting a violation of his procedural due process rights.

"When a discipline hearing may result in a loss of **good conduct time**, the Due Process Clause requires that the prisoner receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 454 (1985). In addition, the discipline hearing officer's findings must be supported by "some evidence in the record." Id." Wilcox v. Aleman, No. 00-6221, 2001 WL 118298 at *1 (10th Cir. Feb. 12, 2001).

Here, Castleberry's grievance, dated March 7, 2003, but received on March 21, 2003, implies that there was a hearing on this issue that Castleberry knew about and/or attended. In the grievance, Castleberry discussed evidence presented at the hearing, including testimony by an officer who testified the Castleberry showed up for work when he was ordered to be present. Castleberry provides no proof that Defendants failed to follow a policy with respect to his request for the 30-day lump sum award, nor does he identify any policy that was violated. Similarly, he provides no documentation that he actually was at work in February 2003, when Defendants demonstrate that he

had at least 12 unexcused absences. In contrast, Defendants provided documentation showing that Castleberry was unexcused from work on at least 14 days of February 2003. [Doc. No. 36, Ex. 6.]

Defendants also produced a document showing that the lump-sum award was being denied because "inmate not eligible due to not receiving full good time." This document also states that it is be investigated further. It appears that Castleberry signed this document showing that he had been informed of this decision and of the right to appeal. The form also showed that he waived his appearance, so it is unclear whether he was present at the hearing or not, and/or how he knew about certain evidence that was presented at the hearing. [Doc. No. 36, Ex. 6.] A subsequent document, dated March 20, 2003, states that Castleberry was not eligible for good time for February due to having 12 unexcused absences. It also states "no much G.T. [good time] due to his program being interrupted." It appears to be signed by Classification Officer Donna Sylvestre. [Id.]

Castleberry fails to raise a genuine issue of material fact regarding how his due process rights were violated. He neither alleges nor provides any evidence that he was not informed of the hearing, that he was denied the right to present witnesses or testimony on his behalf, nor that Defendants violated specific policies with respect to this denial of the lump-sum award. Thus, the claim must fail.

## Recommended Disposition

After construing Castleberry's *pro se* pleadings liberally, as it must, the Court recommends that summary judgment be entered in favor of the Correction Department Defendants and Dr. Penn, and that Castleberry's amended complaint be dismissed, with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge

28